The petitioner belonged to John Thoroughgood, as a slave for life. He purposed to set her free at twenty-eight years of age; and in the meantime sold her to Thomas McIlvaine, and took his bond in $200, obliging him to free her at twenty-eight. She was actually sold to that time, with the understanding of all the parties; *Page 98 
though the bill of sale was general, without specification or limit as to time. McIlvaine sold her to one Stewart, he to Warren and Warren to James Anderson, as it was alledged, to be free at twenty-eight; but the transfer was by endorsement on the, first bill of sale, which was general. Thomas McIlvaine executed a manumission in pursuance of his bond on the 20th of March, 1844, some time after Sarah had attained twenty-eight. She filed a petition for freedom on the 18th of November, 1845, against James Anderson, who transferred her to Caleb B. Sipple, his son in law, on the 21st of November. Mr. Anderson appeared to the suit on the 24th of April, 1846, and disclaimed title.
The plaintiff filed a petition for freedom against Sipple on the 23d of October, 1846, and he re-transferred her to Anderson on the 24th, and on the 26th appeared to the suit and disclaimed title.
The plaintiff also filed a petition for freedom against John M. Rawlins, another son in law of Anderson, on the 23d of October, 1846. He appeared on the 25th and disclaimed title.
Pending these proceedings the petitioner was taken to Baltimore, to remain, as was alledged on the one side, in the family of a friend temporarily; on the other, for the purpose of evading the judgment, and for exportation and sale.
Mr. Layton, in her behalf claimed a decree of freedom, on these grounds: — 1. That Anderson bought the petitioner with knowledge that she was to he free at twenty-eight, and at a corresponding price; 2. That the transfers pending litigation were in evasion and fraud of the law, and a virtual admission of her right to freedom; 3. That she was a manumitted slave and the period of service had expired; that McIlvaine in selling her, retained the right to execute a manumission in pursuance of his bond; which he had accordingly done; and 4. That she had been illegally exported from the State, against the statute, [Dig. 154,] and was free in consequence of that act. He relied that the depositions proved such an exportation, with an intent to have her sold in a southern, market, from which she was rescued only by the timely arrival of McIlvaine in Baltimore in her pursuit.
Mr. Bayard and Mr. Saulsbury, for the defendant, contra, insisted that the petitioner was a slave for life. The bill of sale from John Thoroughgood to Mr. McIlvaine was general, and the title had been assigned to Stewart, Warren and `Anderson, by endorsement. The right of property passed to Anderson as fully as it was *Page 99 
in Thoroughgood. The bond of McIlvaine did not free her; it only rendered him liable to damages, or for the penalty. The bond continued in Thoroughgood's custody. Petitioner was then in McIlvaine's hands a slave for life; McIlvaine being liable to a penalty if he did not free her. He could pay the penalty and keep the slave. He preferred to keep her as a slave, and sold her as such, and she came as such to Anderson. They said neither McIlvaine, Stewart nor Warren would be allowed to impugn the title derived from them, against their own written conveyance. The rules of evidence are the same in respect to this kind of property as any other. No one, after having sold and conveyed the full property, can be allowed to prove he sold it only in part. Neither could the subsequent manumission by McIlvaine affect the rights of purchasers from him.
They objected to the disclaimers as not having any force, because they were made by counsel. They ought to be personal and signed by the defendant. A disclaimer merely authorizes a decree of freedom as against the party disclaiming; and only in respect to his title at the time ofthe service of the summons. The conveyance to Sipple was before service of summons; which was notice of the suit. They admitted that an attempt to transfer a slave, after notice of the petition of freedom, would be in violation of the disclaimer. Yet it was no bar to the subsequent acquisition of a title to the slave.
3. In reference to the exportation, they said: — this petition is under a specially delegated jurisdiction in this court. It is not a part of its general jurisdiction. The proceeding is not according to the course of the common law. The right of property is not tried in this way in reference to any other property. The act giving the jurisdiction had probably reference to cases of freedom from birth. But where the freedom is claimed in consequence of a criminal offence, no other evidence of that offence can be received than a conviction for such offence.
No court of special jurisdiction proceeding not according to the common law, can decide a fact which can be ascertained only by the forms of the common law, and by a common law court. There is no other legal evidence of the crime of exporting a slave, than the conviction of the person exporting. The freedom is a forfeiture or result arising from the crime; but the crime can be established only by indictment and conviction. [Moore vs. Bastard, McArthur's Law of Courts Martial 194; 2H. Blac. 98.]
The common law principle is, that a crime or misdemeanor can *Page 100 
only be evidenced, whether for the purpose of punishment or otherwise, by a verdict and sentence of conviction. It is conceded that the freedom is no part of the sentence of conviction, and yet it arises solely from the commission of the misdemeanor. The language of the act of assembly is [Digest 154] every negro, c., exported "against the form and effect of this section," shall thereupon become free. How are the court to determine that the negro is exported, against the form and effect of the section, except by a verdict and sentence of conviction for the misdemeanor, which the section prescribes? The application of the case in McArthur is this: The action was trespass: Lord Mansfield decided that the arrest by the president' of the court martial was illegal, as the court had no authority to try the offence charged — "perjury or subornation of perjury," though committed before a court martial. Why? Because perjury is a common law crime. The case is not fully reported in McArthur, but this is the necessary inference. There can be no doubt that the commission of perjury is an unofficer-like conduct, and on a charge of unofficer-like conduct, with a specification of a conviction for perjury, the party could be tried by court martial and cashiered; but he could not be tried for that or any other offence civil in its character, except upon conviction in a criminal court.
The principle is more fully stated in Sergeant Grant's case, by Lord Loughborough. [2 H. Black. 98-9.] The distinction is drawn between the law of other countries and that of Great Britain; — "offences against the civil peace are tried by the common law courts."
There can be no doubt that a conviction of an offence would justify the trial by court martial of an officer or soldier, but the commission of the offence they cannot try, unless on the evidence of the record of conviction.
Nor does any difference in principle arise in this case from the fact that the court martial is an inferior court; for in the special delegation of authority to the judges of the Superior Court to hear in a summary manner a petition for freedom, the jurisdiction delegated is confined and restricted on the same principles, that those of an inferior court would be. The court have the power delegated to determine the right to freedom; but if that right arises solely from a misdemeanor committed by the master, the authority is not delegated to the court to try that misdemeanor summarily; and, therefore, if the misdemeanor alone gives the right to freedom, (and *Page 101 
this is certainly so under the act,) it must be established by the record of conviction, as that is the only mode in which offences against the civil peace, whether crimes or misdemeanors can be tried. As an illustration; suppose a law were now passed by the legislature, providing that the commission of larceny, perjury, or any other felony or infamous offence, should be a sufficient cause of divorce from the party committing the same; would not the Superior Court, in the exercise of their specially delegated jurisdiction as to divorces, require the evidence of the record of conviction of the offence; or would they proceed summarily to try the fact of the commission of the offence? There can be little doubt the record would be required.
But what is the evidence of exportation? Export — what? To take or send out for traffic. A citizen may take his slave out with him any where for temporary use. If Anderson sent the slave out for an innocent purpose, it does not free her. The testimony shows he took her to the Nanticoke, and sent her to Baltimore, to keep her out of the way until spring court; to keep McIlvaine from persuading her off pending the proceedings for her freedom.
Layton, in reply. — The bill of sale from John Thoroughgood to McIlvaine, and bond of McIlvaine to John Thoroughgood, were one transaction, and formed one instrument. They were evidence of a sale by Thoroughgood to McIlvaine of this negro, not for life, but until twenty-eight years old. The two instruments are in the same hand; executed at the same time, before the same witnesses. The bill of sale is not for life, nor for years, but it sells the girl to McIlvaine, his heirs, c., generally; and the bond then obliged McIlvaine to set her free at twenty-eight years old. The two papers together then make it a sale until twenty-eight years old; and when that came the girl was free or was the slave of Thoroughgood. McIlvaine sold her and she was transmitted to Anderson by the same title, and with full knowledge. The bill of sale incorporated with the bond, and construed together, bound his assigns. The evidence proves the notice to the assignees: the price proves it.(a) *Page 102 
2. The disclaimer. The record of the petition is notice. The petition was filed and summons issued the same day, and probably served forthwith. Caleb B. Sipple never purchased the girl of Anderson; the transfer was a mere cover; and Anderson disclaimed the title whilst she was in fact merely hired to Sipple. The disclaimer is general, and applies to the whole time from the time the petition was filed; otherwise it would have been special.
3. The exportation. James Anderson is not on his trial for exporting a slave. The question is of certain rights accruing to a third person by reason of a fact properly in issue in this cause, and necessary to be tried here on this petition.
To require a conviction first would in effect repeal this clause of the act, which ought to have a liberal construction in favor of freedom. If the party exporting should die or abscond; if the State should neglect to prosecute; if from any cause a trial in the criminal court should not be had, the slave though declared free by the law, could have no benefit from this humane provision. The contrary has always been the construction. [Thorn vs. Laverty Jones, October term, 1842, where petitioner was decreed free because he had been sold with intent to export. Negro Isaac vs. George Ferguson, C. P. November, 1794, Wils.Notes; Negro Jemima vs. William Ross 1796, ib.; Negro Brister vs. E. Dickerson's adm'r. 1792, ib. 168; (b)] *Page 103 
 The Court entered a decree of freedom on the proof of exportation; from which an appeal was taken to the Court of Errors and Appeals; where the judgment was afterwards affirmed. [See post, June term, 1849.]
Chief Justice Booth said that if the position taken for the defendant was correct, that because the exportation was a misdemeanor, no other evidence of the fact could be received, on a petition for freedom, than the record of the conviction of the offender, it would also follow that because an assault and battery is a misdemeanor, no other evidence of the fact of beating would be admissible in a civil suit for damages than the verdict and judgment against the offender in the criminal case. Now precisely the opposite of this, is the correct doctrine of the law? Whenever the same act which inflicts an injury upon an individual, also constitutes an offence against the public peace, a civil suit may be prosecuted to judgment, before, after, or without an indictment; except in those cases of felony, where the civil injury is merged in the criminal offence. But in no case, is the verdict and judgment in a criminal prosecution, admissible in evidence in a civil suit, to prove the same facts *Page 104 
upon which the conviction was founded. Such is the law as laid down by Starkie, Phillips and Greenleaf on evidence.
Moore vs. Bastard, 2 McArthur on Courts Martial 194, will not bear out the application which was made of it in the argument. Colonel Moore commanded a regiment quartered at Bristol, in England. He preferred charges against some officers for disobedience to an order; in consequence of which, a court martial was convened. Sergeant Major Warden was called as a witness, by the prosecutor, Colonel Moore. The court, from some apparent contradiction in his testimony, which was explained at the time, committed Major Warden to the guard-house for perjury, and put Colonel Moore under close arrest, for subornation of perjury. Colonel Moore brought an action for false imprisonment, against Colonel Bastard, the president of the court martial. Sir James Mansfield directed the jury to find a verdict for the plaintiff, because "thearrest was totally illegal." Why? Because neither by the mutiny act, nor by the articles of war, had a military court martial any power to try the offence of perjury; and, therefore, to inflict a punishment without any trial, and when, as Sir James Mansfield observes, "there was no perjury, nor any thing like perjury, was as extraordinary a mistake as any court martial could fall into." In the case of Sergeant Grant vs. Gould, 2 Hen. Black., Lord Loughborough says, "the object of the mutiny act is to create a court with authority to try those who are a part ofthe army; and the object of the trial is limited to breaches of militaryduty; (page 100) — and therefore ordinary offences against the civilpeace and general law of the land, *Page 105 must be tried in the common law courts. [p. 99.] If the Superior Court, upon hearing the petition of Sarah Thoroughgood, should undertake to try, convict, fine, and imprison Anderson, for the criminal offence of exporting a slave, the principles laid down by Sir James Mansfield and Lord Loughborough, would apply.
McArthur (vol. 2, 193) seems to consider that a Naval Court Martial has authority to punish for perjury committed by a witness in the course of his examination before such a court. Suppose it to be so; and suppose further, that an officer attached to a British squadron, while cruising on the high seas, is examined as a witness before a naval court martial; and afterwards it is ascertained that he committed perjury. Charges are preferred against him for conduct disgraceful to an officer and a gentleman. The specification is, that upon his examination as a witness before the court martial, he prevaricated and committed perjury; if no other evidence is admissible than the record of his conviction before a common law court, the offender must be acquitted and escape punishment; or else be sent to England to be indicted and tried; and if convicted, then to be tried by a Naval Court Martial, and punished a second time for the same offence.
The illustration drawn from the supposed law making "the commission of larceny, perjury, or any other felony, or infamous offence, a sufficient cause of divorce from the party committing the same," does not, in my opinion, help the argument. In such a case, the commission of the offence would not violate any civil right of the other party. In the proceeding for a divorce, it would be unnecessary to prove any of the facts or circumstances on which the conviction was founded. Nothing else would be allowed, or be requisite, than to prove the mere fact of conviction; which could be done only by the production of a copy of the record of the judgment, which would be conclusive; and the divorce must follow, as one of the legal consequences of the conviction. Another legal consequence is, that the party is rendered incompetent to be a witness; and by the Constitution of this State, he is deprived of the right of suffrage. In all such cases, the only competent evidence is the record of the verdict and judgment, to prove the mere fact that such a conviction took place. When that is proved, the judgment is conclusive upon all its legal results.
My opinion therefore, is, that a decree should be entered, that Sarah Thoroughgood is entitled to her freedom.
a Negro Beck vs. Edward Holiday. November Term, 1804, Kent. [Judge Rodney's MS. Notes.] Petition for freedom.
Mrs. Wood. — I heard Edward Holiday say he did not buy Beck for life, but would not tell her so. Three years ago I heard the father say so. — Beck had been in possession of Edward Holiday five years.
George Clow. — Has heard Edward Holiday, the elder, say he bought Beck of John Cloud, for life. Holiday gave £ 30 for her and her child, say ten years ago. Cloud lived in Maryland. Cloud said he took a bond from Edward Holiday, that Beck was to be free in six or seven years.
Nehemiah Cloak, for defendant. — Cloud told me he sold Beck for life.
Edward Notts. — Cloud lived in Delaware when he sold.
 Cur. ad. vult till next term.
New Castle, May 31, 1805. The court adjudged Negro Beck free, c.
b The Reporter finds among the notes of the late Judge Rodney, which were kindly furnished him by that gentleman, the following memorandum of old cases under this statute: —
Negro Abram vs. Edward Burrows. Court of Common Pleas. Kent. November term, 1804. Petition for freedom. This case was argued last term, and postponed on account of a division of opinion between Chief Justice Booth and Judge Barratt, Judge Rodney being absent.
The facts were that Abram was the property of Edward Burrows, who resided in Maryland, and had a farm in Delaware, on which his brother Lewis lived as a tenant. Abram was sent to plow several days, two or three, and also to save fodder two or three days, in the years 1802-3.
Hall and Ridgely, for Burrows. — No proof that the negro came into this State by order or permission of his master, and Lewis Burrows says he paid no wages to or made any agreement with his master.
Bassett, for petitioner. — Morris saw Abram work two or three times; Lewis Burrows said he worked three or four days, but not whole days; that he returned work to Edward for it; that he came with his master's plows and horses; assisted to plow in wheat and save fodder. Burrows lived three miles from this farm.
Bayard, in conclusion, cited Guy's case.[*]
The Court, after considering the case, consider that from the evidence the master sent his slave with his team to work in Delaware, and was to receive compensation by way of labor again, which amounted to a hiring or sale; and therefore is a bringing into the State, under the act so as to entitle negro Abraham to his freedom. Whereupon, Messrs. Ridgely and Hall pray an appeal to the Court of Errors and Appeals.
Bayard, Clayton and Bassett, for petitioner.
Ridgely, Hall and Fisher, for defendant.
[*] The case of Negro Guy vs. James Hutchins, cited by Mr. Bayard.
Note by Rodney. — Guy was sent by his master with a cart load of wheat to sow on his farm in Delaware. Decreed free.
Cedar Swamp Case. — The negro was hired by a person living in Maryland, near the line, of his mistress, who resided in Maryland also. He kept him in the swamp at work; and at one time kept him to work in Wells' Swamp repairing bridges, for the space of two weeks; but slept in Maryland, and carried his dinner with him. Petition discharged.
Blacksmith's Shop Case. — Perhaps negro Tom vs. Banks. The slave worked frequently, say five or six days, in the Blacksmith's shop, in which his master was a partner; but did not sleep in Delaware. After argument the court discharged the petition. His domicil appeared to be in Maryland — and no intention to elude the act of 1787 appeared to the court. *Page 106